IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO.: _____

| | |
|---|---|
| EDWARD C. HALEY as Administrator of the Estate of JOHN DEVIN HALEY,<br>       Plaintiff,<br><br>v.<br><br>WELLPATH, LLC; GARRY L. MCFADDEN in his Official and Individual capacity; THE COUNTY OF MECKLENBURG; OHIO CASUALTY INSURANCE COMPANY; TELISA E. WHITE in her Official and Individual capacity; SHERAY A. DELEON in her Official and Individual capacity; SAVIOR K. JONES in his Official and Individual capacity; ALLIE K. CURRIN in his Official and Individual capacity; "JOHN DOE" in his Official and Individual capacity; JOSETTE C. ALSTON in her Official and Individual capacity as an agent of Wellpath, LLC; ALEXIS M. SPRANKLE in her Official and Individual capacity as an agent of Wellpath, LLC; LEMUELLE A. CLAUD in his Official and Individual capacity as an agent of Wellpath, LLC; CARL R. COOPER in his Official and Individual capacity as an agent of Wellpath, LLC; BRITTNEY L. DEEL in her Official and Individual capacity as an agent of Wellpath, LLC; CHELSEY L. FITZNER in her Official and Individual capacity as an agent of Wellpath, LLC; JAMES E. GRANDBERRY in his Official and Individual capacity as an agent of Wellpath, LLC; LATICE E. HUDSON in her Official and Individual capacity as an agent of Wellpath, LLC; CLIFFORD MATTHEWS JR. in his Official and Individual capacity as an agent of Wellpath, LLC; ZACHARY B. STROUD in his Official and Individual capacity as an agent of Wellpath, LLC; ATIYA J. TORRRENCE in her Official and Individual | **COMPLAINT** |

1

capacity as an agent of Wellpath, LLC; and
DANIEL T. BIONDI in his Official and
Individual capacity as an agent of Wellpath,
LLC,

                         Defendants.

**NOW COMES** Plaintiff, Edward C. Haley, as the Personal Representative of

the Estate of John Devin Haley, by and through counsel, complaining of Defendants

jointly and severally, hereby alleges and says:

## PARTIES

1.      John Devin Haley ("Devin"), Plaintiff's intestate, was a citizen and resident of

Mecklenburg County, North Carolina, when he died on May 22, 2021.

2.      Plaintiff, Edward C. Haley is Devin's father and is the lawfully designated

Administrator of the estate of his deceased son and is a citizen and resident of

Mecklenburg County.

3.      Mecklenburg County is a body politic and corporate within the meaning of

N.C.G.S. § 153A-11, in which capacity it is capable of being sued. Mecklenburg

County is and was at all relevant times, responsible for the establishment and

operation of the Mecklenburg County Detention Center Central ("Detention Center"),

a local confinement facility, and has a duty to make proper rules and regulations for

its operation and to supervise the enforcement of such rules and regulations,

including duties pursuant to N.C.G.S. § 153A-224 and § 153A-225.

4.      Upon information and belief, Defendant Garry L. McFadden ("Sheriff

McFadden") is a resident of Mecklenburg County, North Carolina, and, at all times

relevant to this action, was the elected Sheriff of Mecklenburg County and as such he was the chief law enforcement officer for Mecklenburg County. Sheriff McFadden is sued *in his individual capacity and in his official capacity.*

5.    Defendant Sheriff McFadden is, and at all relevant times, was:

    a.  in control of the Detention Center;

    b.  the final decision-making authority over law enforcement policies and personnel of his office;

    c.  directly responsible for the appointment, retention, supervision and conduct of his officers, nurses, deputies, employees and agents;

    d.  responsible for the care and control of the Detention Center.

    e.  responsible for the care and custody of those detained or held in the Detention Center;

    f.  acting in the course and scope of his official duties as Sheriff of Mecklenburg County and under color of state law;

    g.  the keeper of the Detention Center, pursuant to N.C.G.S. § 162-55, and/or her appointed keepers of the Detention Center; and

    h.  vicariously liable for the actions and inactions of his agents, employees, officers, managers, supervisors, detention officers and/or deputies.

6.    Defendant Sheriff McFadden is vicariously sued as *respondeat superior* in the state tort claims, for the actions and inactions of his agents, employees, officers, managers, nurses, supervisors, detention officers and/or deputies at the Detention Center, all of whom report to Sheriff McFadden.

7.    Upon information and belief, Sheriff McFadden, the Office of the Sheriff, or Mecklenburg County on behalf of the Sheriff, purchased liability insurance or

invested to participate in a local municipal government risk pool that provides coverage for claims made by Plaintiff.

8.     At all times relevant to this complaint, Defendant Ohio Casualty Insurance Company ("Ohio Casualty") was and is a surety company and serves as the surety bond holder for Sheriff McFadden, pursuant to N.C.G.S. 58-76-5 and N.C.G.S. 162-8.

9.     Upon information and belief, Ohio Casualty, as the surety bond holder for Sheriff McFadden, is liable for the acts of Sheriff McFadden and his agents under virtue or color of office resulting in serious harm pursuant to N.C.G.S. 58-76-5.

10.     Upon information and belief, by obtaining coverage via surety bond and/or liability insurance and/or participation in a governmental risk pool, Sheriff McFadden, on his own behalf as well as his agents, waived governmental and sovereign immunity.

11.     Upon information and belief, Defendant Chief Telisa E. White ("Chief White") is a resident of Catawba County, North Carolina and was at all material times and is, at the time of this filing, employed by Sheriff McFadden at the Detention Center and is named herein *in her individual capacity and in her official capacity at the as the Chief of Detention at the Detention Center.*

12.     Upon information and belief, Defendant Major Sheray A. DeLeon ("Major DeLeon") is a resident of Cabarrus County, North Carolina and was at all material times and is, at the time of this filing, employed by Sheriff McFadden and is named herein *in her individual capacity and in her official capacity as the Major overseeing the Detention Center.*

4

13.     Upon information and belief, Defendant Captain Khrislyn G. Mackin ("Captain Mackin") is a resident of Mecklenburg County, North Carolina and was at all material times and is, at the time of this filing, employed by Sheriff McFadden to work at the Detention Center and is named herein *in her individual capacity and in her official capacity as an officer of the Mecklenburg County Sheriff's Office.*

14.     Upon information and belief, Defendant Sergeant Allie K. Currin ("Sergeant Currin") is a resident of Cabarrus County, North Carolina and was at all material times and is, at the time of this filing, employed by Sheriff McFadden to work at the Detention Center and is named herein *in his individual capacity and in his official capacity as an officer of the Mecklenburg County Sheriff's Office.*

15.     Upon information and belief, Defendant Detention Officer Savior K. Jones ("Jones") is a resident of Gaston County, North Carolina and was at all material times and is, at the time of this filing, employed by Sheriff McFadden to work at the Detention Center and is named herein *in his individual capacity and in his official capacity as an officer of the Mecklenburg County Sheriff's Office.*

16.     Upon information and belief, Defendant "John Doe" is a resident of Mecklenburg County, North Carolina, and was, at all material times, an agent and/or employee of Mecklenburg County and/or Sheriff McFadden at the Detention Center. "John Doe" is to be identified and served upon disclosure by Defendants who are in exclusive possession and control of "John Doe's" identity, and "John Doe" is being named as a defendant herein *in his/her individual capacity and in his/her official capacity as an officer of the Mecklenburg County Sheriff's Office.*

5

17. Chief White, Major DeLeon, Captain Mackin, Sergeant Currin, Detention Office Jones and John Doe are collectively referred to herein as the "Detention Defendants."

18. Upon information and belief, the surety bond and/or the purchase of liability insurance or participation in a governmental risk pool waive any claim to governmental or sovereign immunity that the above-named Defendants employed by Sheriff McFadden might claim in their official capacity.

19. Upon information and belief, in their capacity as employees of Sheriff McFadden, none of the above-named Defendant employees are considered public officials, however, the above-named Defendant employees' gross negligence obviates any immunity otherwise applicable for a public official.

20. Upon information and belief, Defendant Wellpath, LLC ("Wellpath") is a foreign corporation, licensed and doing business in Mecklenburg County, North Carolina, with employees, servants, and agents in Mecklenburg County and which, at all relevant times, was under contract with Mecklenburg County and/or Sheriff McFadden and employed and/or contracted onsite clinicians and medical staff to be the medical and mental health care providers for residents of the Detention Center.

21. Upon information and belief, Wellpath contracted with Reserve Health, P.C. for the services of Medical Director, medical physician and medical nursing services for residents and detainees at the Detention Center and those contracted providers were agents of Wellpath.

6

22.    Wellpath is sued herein for its own tortious wrongdoing, as well as under theory of *respondeat superior* for the acts and failures to act of its employees and agents responsible for providing medical and mental health care and services at the Detention Center.

23.    Upon information and belief, Defendant Josette C. Alston ("Alston") is a resident of Mecklenburg County and was at all material times and is employed or contracted as a registered nurse by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

24.    Upon information and belief, Defendant Alexis M. Sprankle, formerly Alexis Christensen ("Christensen") is a resident of Mecklenburg County and was at all material times and was employed or contracted as a physician's assistant by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

25.    Upon information and belief, Defendant Lemuelle A. Claud ("Claud") is a resident of Mecklenburg County and was at all material times and was employed or contracted as a license clinical social worker by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in his individual capacity and as an employee or agent of Wellpath.*

26.    Upon information and belief, Defendant Carl R. Cooper ("Cooper") is a citizen and resident of Union County and was at all material times and was employed or

contracted as a licensed clinical mental health counselor by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in his individual capacity and as an employee or agent of Wellpath.*

27.     Upon information and belief, Defendant Brittney L. Deel ("Deel") is a resident of Rowan County and was at all material times employed or contracted as a registered nurse by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

28.     Upon information and belief, Defendant Chelsey L. Fitzner ("Fitzner") is a resident of Cabarrus County and was at all material times employed or contracted as a registered nurse by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

29.     Upon information and belief, Defendant James E. Grandberry ("Grandberry") is a citizen and resident of Mecklenburg County and was at all material times and was employed or contracted as a licensed clinical social worker associate by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in his individual capacity and as an employee or agent of Wellpath.*

30.     Upon information and belief, Defendant Latice E. Hudson ("Hudson") is a resident of Mecklenburg County and was at all material times employed or contracted as a registered nurse by Wellpath to provide medical and mental health care and

services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

31. Upon information and belief, Defendant Clifford Matthews Jr. ("Matthews") is a resident of Mecklenburg County and was at all material times employed or contracted as a licensed clinical social worker associate by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in his individual capacity and as an employee or agent of Wellpath.*

32. Upon information and belief, Defendant Doctor Zachary B. Stroud ("Dr. Stroud") is a resident of Dare County, North Carolina and was at all material times employed or contracted as a psychiatrist by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in his individual capacity and as an employee or agent of Wellpath.*

33. Upon information and belief, Defendant Atiya J. Torrence ("Torrence") is a resident of Mecklenburg County and was at all material times employed or contracted as a licensed practical nurse by Wellpath to provide medical and mental health care and services to residents at the Detention Center and is named herein *in her individual capacity and as an employee or agent of Wellpath.*

34. Upon information and belief, Defendant Daniel T. Biondi (Dr. Biondi) is a resident of Mecklenburg County, North Carolina, and was, at all relevant times herein, a physician duly licensed under the laws of the State of North Carolina and a health care provider practicing his profession as a doctor with Reserve Health, P.C. and was employed or contracted as an agent and/or employee of Mecklenburg County

9

and/or Sheriff McFadden and/or Wellpath. Dr. Biondi is being named as a defendant herein *in his individual capacity and as an employee or agent of Wellpath*. At all relevant times herein, Dr. Biondi was the Medical Director and Chief Physician of the Detention Center, was charged with the supervision of the medical staff at the Detention Center, including, but not limited to Defendants Alston, Christiansen, Claud, Cooper, Deel, Fitzner, Grandberry, Hudson, Matthews, Stroud, and Torrence, was charged with the care, custody and safekeeping of residents and detainees at the Detention Center, was a keeper of the Detention Center pursuant to N.C.G.S. § 162-55 and was an agent or employee of Sheriff McFadden or, in the alternative Mecklenburg County. Upon information and belief, Dr. Biondi did not form a doctor patient relationship with Devin Haley between April 3, 2021 and May 22, 2021. Thus, Plaintiff's claims against Dr. Biondi do not constitute a medical malpractice claim, pursuant to statute.

35.     Defendants Alston, Christiansen, Claud, Cooper, Deel, Fitzner Grandberry, Hudson, Matthews, Stroud, and Torrence are collectively referred to herein as the "Wellpath Defendants."

## JURISDICTION AND VENUE

36.     Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

37.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983

and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, 2201.

38.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), and 1343(3) (civil rights).

39.     This case is instituted in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and failures to act occurred and in which Defendants maintain offices and/or reside.

40.     Supplemental pendent jurisdiction of state claims is based on 28 U.S.C. §1367 because the alleged violations of federal law are substantial, and the pendent causes of action derive from a common nucleus of operative facts.

## GENERAL ALLEGATIONS

41.     Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

42.     The Detention Center was constructed in 1997 and all operations officially moved into the facility in 1997. It consists of several administration offices, a public lobby and visitation, Booking and Releasing areas, a Medical Station, and five Resident Housing Blocks.

43.     The Sheriff has full legal authority and responsibility for operating the Detention Center. The Detention Center operates under the authority of the Mecklenburg County Sheriff and under the direction of the Facility Commander and Administrative Captain.

44.    At all times herein, a person held at the Detention Center is referred to as a "resident" or collectively as "residents."

45.    By operation of North Carolina statute, the elected Sheriff, through his employees and agents, is exclusively responsible for operations of the Detention Center, which includes supervision of detention staff, oversight of resident medical care, and full compliance with the North Carolina Administrative Code, and all departmental policies, methods, and procedures to ensure security, safety and health of all employees and each resident.

46.    In accordance with 10A North Carolina Administrative Code ("N.C.A.C.") 14 J, the operations of the Detention Center are governed by the following industry standards:

    a. Appalachian State University, Model Policies and Procedures Manual for North Carolina Jails;

    b. American Correctional Association, Standards for Adult Local Detention Facilities;

    c. American Correctional Association, Standards for Small Jails;

    d. National Commission on Correctional Health Care, Standards for Health Services in Jails; and

    e. United States Marshal Service Policy Directives for the provision and management of health care services to prisoners in the custody of the United States Marshals Service.

47.    Under the United State Constitution and the North Carolina State Constitution, the Sheriff has a non-delegable duty to provide adequate medical care, including mental health screenings and treatment, to residents detained at the Detention Center.

48.     Upon information and belief, the Mecklenburg County Sheriff's Department is accredited by the National Commission on Correctional Health Care ("NCCHC") and/or has otherwise agreed to be bound by both medical standards imposed by the State of North Carolina and the NCCHC in the operation of the Detention Center.

49.     The Sheriff, his employees and staff at the Detention Center knew, or should have known, that deliberate indifference to the serious mental health needs of a resident constitutes unnecessary and wanton infliction of pain, as proscribed by the Eighth and Fourteenth Amendments to the United States Constitution, and the parallel provisions of our state constitution.

50.     At all relevant times to this Complaint, and under the express terms of its contract with Mecklenburg County and/or Sheriff McFadden, Wellpath, through its clinical employees and agents, was the sole medical provider responsible for providing medical and mental health care and services to each resident within Detention Center.

51.     Pursuant to its contract, Wellpath was to provide all professional medical, mental health, dental and related health care and administrative services for residents, regularly scheduled sick calls, nursing care, regular physician care, hospitalization, medical specialty services, emergency medical care, emergency ambulance services when medically necessary, medical records management, administrative support services and other services as needed by residents of the Detention Center.

13

52. Upon information and belief, Wellpath contracted with Reserve Health, P.C. for the services of Dr. Biondi as Medical Director of the Detention Center and for the services of other medical staff to provide medical services for residents and detainees at the Detention Center.

53. Upon information and belief, Wellpath is accredited by the National Commission on Correctional Health Care ("NCCHC") and/or has otherwise agreed to be bound by both medical standards imposed by the State of North Carolina and the NCCHC.

54. Wellpath and its employees and agents knew or should have known that deliberate indifference to the mental health needs of a resident is negligent, grossly negligent, and/or willful and wanton.


## FACTS

55. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

56. On April 3, 2021, Devin Haley was arrested for a federal probation violation by Charlotte Mecklenburg Police, transported to the Detention Center, and placed into the custody of the Mecklenburg County Sheriff.

57. On April 3, 2021, after being placed into the care and custody of the Mecklenburg County Sheriff, Devin complied with requests and submitted to the initial mental health interview administered by Wellpath employees/agents, Amanda Thomas and Defendant Torrence.

14

58.    Devin detailed his comprehensive mental health condition, including his diagnoses, the current prescription medications prescribed to treat those diagnoses, his previous psychiatric hospitalizations, as well as his current suicidal ideation.

59.    Upon information and belief, after Devin detailed the names and dosages of the medications he was prescribed and taking to treat his disease, Ms. Thomas and/or Defendant Torrence conveyed to Devin that in order to provide him his medication while at Detention Center, Devin would need to provide Wellpath with a release giving his pharmacist permission to share with Wellpath Devin's pharmaceutical records that included medications, dosages and dispensing history.

60.    Devin complied with requests made by Ms. Thomas and/or Defendant Torrence and signed the release permitting his pharmacist to provide Wellpath with copies of his pharmaceutical records.

61.     Upon information and belief, Defendant Torrence did not request Devin's pharmaceutical records from his pharmacist, or if a request was made, Defendant Torrence did not follow-up with the pharmacy to ensure the records were produced.

62.    The data collected during Devin's mental health exam designated that Devin was classified as a "Level 2" due to the presentation of current suicidal ideation.

63.    "Level 2" designation under Mecklenburg County Detention Center protocol, as well as Wellpath clinical directives, known as "suicide watch", required that Devin's care be escalated for additional, more specialized mental health evaluation and that he be under personal supervision at least four times an hour and housed in a wet cell with no personal property.

15

64. On April 3, 2021, none of the clinicians for Wellpath provided Devin Haley with any of his daily medications.

65. On April 3, 2021, neither the Sheriff nor his employees provided Devin with any of his daily medications.

66. Upon information and belief, no steps were taken at any time by Wellpath or the Sheriff to contact Devin Haley's family to try to coordinate efforts to obtain his current prescribed medications.

67. During the time that Devin was designated as "Level 2" status, Wellpath failed to administer any of Devin's daily medications to him.

68. During the time that Devin was designated as "Level 2" status, neither the Sheriff nor any of his employees administered any of Devin's medications to him.

69. On April 4, 2021, approximately 24 hours after receiving "Level 2" designation, but more than 24 hours since he'd taken his last dose of his daily medications, Wellpath employee/agent, Defendant Claud, who is a licensed clinical social worker and not a physician, had a brief exchange with Devin and suspended Devin's "Level 2" designation.

70. Defendant Claud failed to move Devin from "Level 2" to staggered or special watch and did not document the basis for his decision not to do so, in violation of Wellpath policy.

71. 10A N.C.A.C. 14J .0601 required that Devin be removed from special watch by a physician. Defendant Claud was not a physician and therefore not a proper person to remove Devin from "Level 2" and place him in general population.

16

72. Once his "Level 2" designation was suspended, so was the intensive personal oversight and additional supervision required under the designation and Devin was placed into orientation for transition into general population within the Detention Center.

73. Upon suspension of his "Level 2" designation, Defendant Claud failed to administer any of Devin's daily medications to him.

74. At no time on April 4, 2021, did Wellpath or the Mecklenburg County Sheriff administer Devin's daily medication to him.

75. Despite performing a post suicide watch release follow-up with Devin on April 5, 2021, Defendant Matthews, a licensed clinical social worker associate, failed to address the issue of Devin's prescription medication for treatment of his mental health illness.

76. Despite performing a post suicide watch release follow-up with Devin on April 10, 2021, Defendant Grandberry, a licensed clinical social worker associate, failed to address the issue of Devin's prescription medication for treatment of his mental health illness. Instead, Defendant Grandberry simply referred Devin for an initial mental health assessment and visit with psychiatry.

77. Defendant Grandberry next saw Devin on April 14, 2021 to perform the initial mental health assessment he had scheduled four days earlier.

78. Defendant Granberry noted Devin's diagnoses of bi-polar disorder, severe depression disorder and (generalized) anxiety disorder in the assessment.

17

79. Defendant Granberry documented that Devin had last been hospitalized in January of 2021, that prior to his incarceration Devin's bi-polar, severe depressive and anxiety disorders were being treated with Wellbutrin and Lamactil, and further noted that as of the April 14, 2021 examination, Wellpath had not verified that Devin was being treated with the Wellbutrin Lamactil drug combination.

80. Defendant Granberry took no steps to confirm Devin's prescriptions or to administer Devin his daily dosage of Wellbutrin and Lamactil.

81. After completing Devin's mental health examination, Defendant Granberry referred Devin to a psychiatric prescriber.

82. Despite having data on his comprehensive mental health diagnosis, history of suicidal ideation and prior suicide attempts, and having a signed release for his pharmaceutical records in hand, at no time between April 3, 2021 and April 14, 2021, did Wellpath provide Devin with any of his prescribed daily medications.

83. Despite having data on his comprehensive mental health diagnosis, history of suicidal ideation and prior suicide attempts, and having documentation that Wellpath collected a signed release for his pharmaceutical records, at no time between April 3, 2021 and April 14, 2021, did the Sheriff ensure that Wellpath was providing Devin with any of his prescribed daily medication.

84. Despite having data on his comprehensive mental health diagnosis, history of suicidal ideation and prior suicide attempts, and having a signed release of his pharmaceutical records in hand and understanding that with each day that passed without his medication, Devin's disease was left untreated, at no time between April

18

3, 2021 and April 14, 2021, did Wellpath take steps to prescribe Devin with any of his daily medication.

85. At all relevant times, the Detention Center made use of a POD Kiosk System ("Kiosk") which served as the electronic platform to facilitate communication between residents and Detention Center staff and medical providers.

86. The Kiosk was the method proscribed by the Detention Center for residents to make requests for services and information, or to report status on treatment and conditions.

87. At all relevant times, employees designated by the Sheriff or employees/agents designated by Wellpath were assigned to collect and manage communications made through the Kiosk.

88. Employees assigned to manage the communication received through the Kiosk were responsible for ensuring that requests requiring coordination or transfer to another provider, designee or agency are properly carried out.

89. While the Sheriff's Department had a grievance system, it routinely refused to accept grievances regarding the provision of medical care and mental health care, instead requiring the residents to continue to submit medical requests that went unanswered.

90. Internal protocols indicate that turnaround response intervals to a resident's Kiosk communication was a maximum of 5 days, excluding weekends and holidays.

91.     On April 13, 2021, after being deprived of 10 days of daily medication, Devin complied with the requirements within the Detention Center and submitted a communication through the Kiosk.

92.     In his April 13, 2021 submission, Devin requested access to a medical clinician to address his daily medication needs and the impact of being deprived of his prescribed medication.

93.     Following Devin's submission, rather than addressing the problem Devin raised, Defendant Fitzner advised Devin that he had made a procedural error in his submission in that Devin had submitted a "grievance" and should have submitted a "sick call request".

94.     Based on Defendant Fitzner's Kiosk message, Devin resubmitted his communication through the Kiosk, reclassifying his request as a "sick call request".

95.     Upon information and belief, on April 15, 2021, twelve days after his incarceration, and the day following Defendant Granberry's initial mental health examination of Devin, Defendant Christensen, without taking steps to contact Devin's pharmacy to verify his current medications, and without speaking to Devin, prescribed Devin the lowest dose of drug Lexapro and prescribed Lamictal.

96.     Defendant Christensen failed to prescribe or administer Wellbutrin to Devin and instead followed Wellpath protocol in prescribing Lexapro.

97.     On April 15, 2021, Wellpath employee/agent, Tiana Motley, noted that Devin declined to take the Lexapro dosage she attempted to administer to him.

98.　On April 15, 2021, as required, Devin used the Kiosk to submit a report that he had not received his daily medication and requested that the Sheriff provide him with his medication, sharing that he needed the medication that "successfully treats my severe depression and energy level." In his April 15th submission, Devin once again provided the details of his treating physician and treating pharmacist.

99.　On April 15, 2021, following Devin's Kiosk submission asking that he be given his daily medications, Defendant Fitzner replied as she did to Devin's previous submission, noting that he erred procedurally in his submission and advised Devin to submit his request through a sick call classification, rather than a grievance-based classification.

100.　On April 16, 2021, Wellpath employee/agent, Tiana Motley, noted that Devin declined to take the Lexapro dosage that she attempted to administer to him.

101.　On April 16, 2021, Wellpath employee/agent, Tiana Motley failed to administer Devin's daily dosage of Wellbutrin.

102.　On April 17, 2021, Wellpath employee/agent, Annette Black, documented that Devin declined to take the Lexapro dosage that she attempted to administer to him.

103.　On April 17, 2021, when Annette Black failed to provide Devin with his daily dosage of Wellbutrin, Devin again took steps to try to resolve the issue by submitting yet another report via the Kiosk, communicating again that he continued to be deprived of his daily medications and again, provided contact details for his treating pharmacist.

104.    The following day, April 18, 2021, Defendant Claud replied to Devin's April 17th Kiosk submission by advising Devin that he would be scheduled to come to the Detention Center's clinic to be assessed by the medical staff.

105.    On April 18, 2021, the Sheriff's employees moved Devin from the Detention Center's orientation pod into its general population, specifically to Pod 6800, where Devin was placed into a single person cell. This move was made despite knowing of Devin's previous assignment to suicide watch and knowing that he was not taking the Lexapro prescribed under Wellpath protocol.

106.    At no time on April 18th, was Devin provided his daily dosages of Wellbutrin.

107.    On April 19, 2021, Devin again took steps to try to receive his daily medications by submitting a request through the Kiosk to report that he had not received his daily dosage of medication and specifically requested his 300mg Wellbutrin medication.

108.    On that same day, despite Devin's attempts to implore staff to provide him his daily Wellbutrin medication, Wellpath employee/agent, Natalie Irvin, attempted to administer Lexapro to Devin and documented that he again declined the dosage of Lexapro.

109.    At no time on April 19, 2021 did Natalie Irvin attempt to provide Devin with his daily dosage of Wellbutrin.

110.    In response to Irvin's attempts to administer Lexapro, Devin made yet another submission through the Kiosk to report that he continued to be deprived of his daily medications by stating, "I'm still in need to Wellbutrin for depression." And as in his

previous communications, Devin included contact details for his current pharmacist in his April 19, 2021 submission.

111. On April 20, 2021, Wellpath employee/agent, Annette Black, attempted to administer Lexapro to Devin and noted that Devin declined the dosage.

112. At no time on April 20, 2021 did Annette Black attempt to provide Devin with his daily dosage of Wellbutrin.

113. That same day, April 20, 2021, in response to Devin begging for his daily medication of Wellbutrin and/or the psychiatric referral made by Defendant Grandberry, Wellpath employee/agent, Defendant Dr. Stroud, completed a psychiatric evaluation on Devin.

114. During Dr. Stroud's psychiatric evaluation, he inquired about Devin's psychiatric history, and Devin confirmed what had been documented previously, including his complex history of Bi-polar disorder and depression, hi substance abuse disorder, his previous psychiatric treatment, previous suicide attempts and his numerous admissions to psychiatric hospitals, and even relayed a family history of psychiatric disorders.

115. At the April 20th psychiatric evaluation, Devin's body chemistry had been deprived of his daily medication dosages for 17 continuous days.

116. Despite knowing that Devin had not received his daily medications for 17 straight days, that he made multiple requests for the medications that had successfully treated his symptoms and as he personally attested, were effectively and

23

successfully managing his disease, Defendant Dr. Stroud declined to verify Devin's prescriptions with his pharmacy or to provide Devin with his daily Wellbutrin.

117. Despite knowing that Devin had declined to take dosages of Lexapro and was begging for Wellbutrin, Defendant Stroud advised he would be administering a drug named "Cymbalta" to Devin, along with increasing his Lamictal to twice daily and adding Hydroxyzine daily.

118. At no time on April 21, 2021 did the Mecklenburg County Sheriff or any associated agent ever administer Devin's daily dosage of Wellbutrin.

119. On April 22, 2021, Wellpath employee/agent, Antoinette Thomas, attempted to administer Cymbalta to Devin and he declined the dosage.

120. At no time between April 22, 2021 and April 26, 2021, did the Mecklenburg County Sheriff or any associated agent ever administer Devin's daily dosage of Wellbutrin.

121. On April 26, 2021, Devin made his seventh submission through the Kiosk system regarding his medication but this time, Devin's submission expressly pled for help stating, "Having a seriously rough time with the new meds and would like to talk to the doctor about putting me back on my Wellbutrin."

122. On April 27, 2021, in response to Devin's report of ill-effects of his medication and begging for Wellbutrin, Defendant Deel replied to Devin by advising him of his procedural error, that he erroneously classified his submission under a grievance-based submission, and advised that his was a sick call, not a grievance classification.

123.    Other than the admonishment over Devin's erroneous classification, no action was taken on April 27th by the Sheriff, his staff, or his agents, including those employed or contracted by Wellpath, in response to Devin's April 26th plea for help.

124.    On April 28, 2021, more than 48 hours later, Wellpath employee/agent Emily Grimes forwarded Devin's April 26th submission to Defendant Cooper.

125.    At no time between April 26th and April 28th, 2021 did the Sheriff, his staff or agents, including those employed or contracted by Wellpath, ever administer Devin his daily medications of Wellbutrin.

126.    On April 28, 2021, Defendant Cooper responded to Devin's April 26th request by advising him that an appointment with psychiatry had been scheduled and noted that Devin was not taking medications that Sheriff's employees/agents had attempted to administer. Despite knowing that Devin has not been properly medicated for over 25 days, nothing is done to change his housing or supervision.

127.    At no time on April 28th did Defendant Cooper provide Devin with his daily dosage of Wellbutrin.

128.    On April 27, 2021, April 28, 2021, and April 29, 2021, Wellpath employees/agents, Victoria Cordova and Antoinette Thomas, attempted to administer Cymbalta to Devin.

129.    Devin declined dosages of Cymbalta offered by Defendant Cordova and Defendant Thomas and both documented accordingly.

130.    On April 29, 2021, Devin submitted another plea for help through the Kiosk system and this time wrote, "Wellbutrin, definitely need it, please give it." No action

25

was taken by the Sheriff, his staff or agents, including those employed by Wellpath, on April 29th in response to Devin's submission.

131. At no time on April 29th did the Sheriff, his staff or agents, including those employed or contracted by Wellpath, administer Devin's daily dose of Wellbutrin.

132. The following day, April 30, 2021, in response to Devin's April 29th submission reporting his need for help, Defendant Cooper responded by notifying that a follow-up visit with psychiatry had been scheduled and reminded that during that appointment it would be good time for Devin to discuss medication changes.

133. At no time between April 30, 2021 and May 2, 2021 did the Sheriff, his staff or agents, including those employed or contracted by Wellpath, administer Devin's daily dosage of Wellbutrin.

134. Between April 30, 2021 and May 2, 2021, Wellpath employees/agents, Janika Campbell, Annette Black, and Amanda Thomas, offered Cymbalta to Devin, he declined the doses and Campbell, Black and Thomas each respectively made note of Devin's refusal accordingly.

135. On May 2, 2021 Wellpath employee/agent Defendant Claud, met with Devin for an evaluation in response to Devin's April 26th request for help and/or a referral made by a Sheriff's employee who noted Devin had harmed himself by giving himself a black eye. During the appointment, as he'd expressed countless times previously, Devin reported that he had not been given his daily Wellbutrin, that Wellbutrin had had a particularly effective impact on his disease and asked Defendant Claud for the medication.

26

136.   Unlike the previous examinations and evaluations Devin submitted to at the Detention Center, at the May 2nd visit, Devin disclosed that as a result of the protracted absence of the regulating factors provided by Wellbutrin, Devin was experiencing the sort of dysregulation that had led to self-harm.

137.   In his May 2nd visit with Defendant Claud, Devin disclosed that he had engaged in self-harm by punching himself in his eye socket. Defendant Claud documented Devin's disclosure of self-harm, as well as the visible physical injury that corroborated Devin's claim.  After completing his evaluation of Devin, Defendant Claud referred Devin to psychiatry.

138.   Despite knowing that Devin has not been properly medicated for over 29 days, and had engaged in self-harm, nothing is done by Defendants to change his housing or supervision. In accordance with 10A N.C.A.C. 14J.0601(c)(4), Devin engaging in self-injury should have immediately resulted in him being placed on special watch with an increase in supervision checks from twice hourly to four times an hour.

139.   On May 2, 2021, Devin submitted a sick call request to Wellpath that stated "Wellbutrin."

140.   At no time on May 2, 2021 did Defendant Claud administer Devin's daily dose of Wellbutrin, even after collecting and confirming evidence of Devin's mental and physical deterioration and/or receiving the additional plea from his May 2nd submission via the Kiosk.

141.   On May 3, 2021, Defendant Cooper responded to Devin's May 2nd request by telling him that an appointment with psychiatry had been scheduled.

142. On May 3, 2021, Devin made a submission via the Kiosk reporting his need for Wellbutrin and conveying that "[g]uards and people have been getting very concerned."

143. Later, on May 3, 2021, Devin made another submission, but classified the submission as grievance-based, requesting help from a specialist and reporting his need for a stronger mood stabilizer and/or anti-psychotic medication.

144. Neither the Sheriff nor any member of his staff or any of his agents, including those employed or contracted by Wellpath, responded to Devin's pleas for help on May 3, 2021.

145. The reply to Devin's May 3rd pleas for help came in the form of a writing sent by Defendant Alston on May 4, 2021 which read:

> *MD provider is giving you Cymbalta 30 mg every day in place of the Wellbutrin.*

146. On May 5, 2021, Devin made a Kiosk submission requesting information about the Detention Center's substance abuse program.

147. Devin received no response to his inquiry other than a message that was sent 12 days later stating that Devin been placed on a list to be screened in the future to determine his eligibility to potentially participate in the Center's substance abuse program.

148. On May 6, 2021, more than 30 days after he had been placed in the care and custody of the Mecklenburg County Sheriff, Devin made another plea by submitting a request to meet with medical staff regarding questions he had concerning medications.

28

149.    In response to his May 6th request, Wellpath employee/agent, Tammy Paterson responded by messaging Devin asking what questions Devin had and whether he was experiencing side effects from the medications.  There was no further response by the Sheriff, his staff or agents, including those employed or contracted by Wellpath, to Devin's request to meet and speak with medical staff about his medication on May 6, 2021.

150.    On May 8th and 9th, 2021, after no follow-up from medical staff, Devin made another sick call-based submission through the Kiosk system requesting to speak with medical staff regarding the medication he received at night.

151.    On May 9, 2021, Defendant Claud sent a message through the Kiosk stating that a clinical assessment would be scheduled.  No additional inquiry or action was taken was taken by the Sheriff, his staff or his agents, including those employed or contracted by Wellpath, on May 9, 2021, in response to Devin's May 8, 2021 submission.

152.    On May 10, 2021, Defendant Cooper sent a message through the Kiosk system notifying Devin that due to his May 9th request, an appointment with Psychiatry had been scheduled and that he could discuss medication at that appointment. No appointment was actually provided to Devin and no additional inquiry or action was taken was taken by the Sheriff, his staff or his agents, including those employed or contracted by Wellpath, on May 10, 2021, in response to Devin's May 8, 2021 submission.

29

153. Devin was not seen by any members of the medical or psychiatric team on May 10, 2021.

154. On May 11, 2021, Defendant Hudson sent Devin a message through the Kiosk system eight days after Devin's May 3rd submission, stating that "that mental health has responded to his sick call requests".

155. Documentation, notes and reports confirm that at no time did the Sheriff, his staff or agents, including those employed or contracted by Wellpath, fulfill any of Devin's sick call requests and provide him with his daily dose of Wellbutrin, contradicting Defendant Hudson's claims that mental health has responded to his sick call requests in her May 11th message to Devin Haley.

156. On May 11, 2021, Devin made yet another sick call-based request through the Kiosk system imploring to meet and talk with a Wellpath provider about his nighttime medication.

157. Devin was not seen by any members of the medical or psychiatric team on May 11, 2021.

158. On May 12, 2021, Defendant Cooper sent Devin a message through the Kiosk system stating that in response to his request made on May 11th, that Devin was scheduled for a follow-up appointment with Psychiatry. No additional inquiry or action was taken by the Sheriff, his staff or his agents, including those employed or contracted by Wellpath, on May 12, 2021, in response to Devin's May 11, 2021 request for help.

159. Devin was not seen by any members of the medical or psychiatric team on May 12, 2021.

160. On May 12, 2021, Devin made another sick call-based submission requesting to speak with medical "about [his] psych meds".

161. On May 13, 2021, Defendant Cooper sent a message through the Kiosk system in reply to Devin's May 12th request, that Devin had been scheduled for a follow-up appointment with Psychiatry but again he did not provide Devin with a date. No additional inquiry or action was taken by the Sheriff, his staff or his agents, including those employed or contracted by Wellpath, on May 13, 2021, in response to Devin's May 12, 2021 submission.

162. Devin was not seen by any members of the medical or psychiatric team on May 13, 2021

163. On May 14, 2021, Devin made another sick call-based submission requesting to talk with medical staff about his nighttime medications.

164. Devin was not seen by any members of the medical or psychiatric team on May 14 or 15, 2021.

165. On May 16, 2021, Defendant Claud sent a message via the Kiosk system in answer to Devin's May 14th request, stating that he will be scheduled to come to the clinic for an assessment. Defendant Claud did not tell Devin that Devin was not scheduled to see a mental health provider until July 13, 2021. No additional inquiry or action was taken by the Sheriff, his staff or his agents, including those employed

31

or contracted by Wellpath, on May 16, 2021, in response to Devin's May 14, 2021 submission requesting help with his medication.

166. On May 10, 2021, May 14, 2021, and May 16, 2021, Wellpath employees/agents, Linda Valeria, Janika Campbell, and Annette Black, noted that Devin did not take his prescribed Cymbalta.

167. After the initial report, on or about May 2, 2021, that Devin had started engaging in self-injury and throughout the weeks that followed when Devin submitted request after request, pleading for Wellbutrin, detention officers detected that Devin had been taking steps to prevent his cell door and trap from being opened by detention officers.

168. On May 17, 2021, a detention officer documented that Devin had been, over the course of the previous days, repeatedly using contraband to cause his cell door to become inoperable from the outside, which was preventing detention officers from accessing Devin and the cell in which he had been placed.

169. On May 17, 2021, a detention officer reprimanded Devin for the violations, documented the reprimand and noted further that Defendant Sgt. Currin had been notified of the offenses, as well as the reprimand that was issued in response.

170. Defendant Sgt. Currin did nothing to investigate whether Devin's behavior in repeatedly blocking his door was in anyway attributed to his further decompensation.

171. On May 20, 2021, Wellpath employee/agent, Mary Raudebaugh, offered Devin Cymbalta, he declined the dose and Raudebaugh documented it accordingly.

32

172.   While in the care and custody of the Mecklenburg County Sheriff, Devin Haley made a total of 16 submissions through the Detention Center's Kiosk system involving requests, reports and/or concerns surrounding his need for his daily dose of Wellbutrin medication.  Those 16 submissions occurred over the course of 31 days beginning on April 13, 2021 and ending on May 14, 2021.

173.   According to the records created by Wellpath, during the time that Wellpath was overseeing and managing Devin Haley's medical care while in the custody of the Sheriff, Devin's illness went unmedicated 33 of the 50 days he was detained or more than 60% of the time that the Sheriff and Wellpath were in charge of Devin's medical needs.

174.   According to Wellpath records, Devin's requests to receive the medication prescribed by his treating physician, the medications he reported had been effectively treating his illness and managing his symptoms, his pleas for those medications were rejected 100% of the time by Wellpath clinicians.

175.   Following his April 20, 2021 psychiatric evaluation by Defendant Dr. Stroud, and despite documenting that a referral was made on May 2, 2021 for an evaluation by a psychiatrist, Devin Haley was never again examined or evaluated by a psychiatrist while in the care and custody of the Mecklenburg County Sheriff.

176.   Despite being aware that Devin had a history of mental illness, had been suicidal in the past, had engaged in self-injury and was not regularly taking his medication prescribed by Wellpath, Sheriff McFadden's employees and agents did nothing to increase their supervision of Devin, or move him to a cell with other

residents or otherwise guard for the reality that Devin was likely to become more depressed as a result of his current circumstances.

177.  According to rule 10A N.C.A.C. 14J .0601(a), North Carolina's detention officers are mandated to uphold minimum supervisory standards that require in pertinent part:

> (a) Officer shall make supervisory rounds and *observe* each inmate in person at least twice per hour on an irregular basis. The supervision rounds shall be documented.
>
> (c) Officers shall *observe, at least four times per hour*, inmates who display the following behavior:
>
>> (4) (C)  . . . engaging in self- injury.

178.  On May 21, 2021, the Mecklenburg County Sheriff failed to comply with the minimum standards proscribed in 10A N.C.A.C. 14J .0601(a), breaching his duty by failing to comply with the minimum supervision requirements in Pod 6800, where Devin Haley resided, between the hours of 2:00 p.m. and 6:00 p.m.

179.  The morning of May 22, 2021, Defendant Jones, arrived on post to Pod 6800 and began his shift as a detention officer shortly before 7:00 a.m.

180.  As he was trained to do and required to carry-out, Defendant Jones reported completing a pre-pod inspection at 7:02 a.m. and that during his pre-pod inspection, Defendant Jones viewed Devin Haley and was acknowledged by Devin during that inspection.

181.  Defendant Jones reported completing supervision rounds at 7:28 a.m. and 7:51 a.m. but failed to comply with the requirements of 10A N.C.A.C. 14J .0601(a), as

Jones failed to observe or hear Devin Haley during either round and took no steps to do so while completing either his 7:28 a.m. or 7:51 a.m. supervision rounds.

182. According to Mecklenburg County Detention Center's own protocol and as proscribed in writing in its Resident Handbook, residents are required to be present during pod headcounts and/or pod roll calls which are required to be completed throughout each day as well as at each of the three daily, scheduled meals.

183. Records reflect that the breakfast cart was delivered in its normal fashion and at a typical time, 8:13 am, to Pod 6800 on May 22, 2021.

184. Without basis or explanation, records reflect that Defendant Jones failed to complete the required resident headcount before or after breakfast was served on May 22, 2021.

185. Without explanation, Defendant Jones reports that he has no recollection whether Devin Haley reported to breakfast on May 22, 2021.

186. Internal surveillance camera video footage captured and recorded from within Pod 6800 confirms that the door to the cell in which Devin was placed did not open when residents were alerted that breakfast was being served on May 22, 2021.

187. Internal surveillance camera video footage captured and recorded from within Pod 6800 confirms that Devin did not exit his assigned cell, nor any other cell within Pod 6800 before, during or after breakfast was served to residents on May 22, 2021.

188. Defendant Jones reported that he completed supervision rounds at approximately 8:29 a.m., 9:11 a.m., 9:26 a.m., 10:03 a.m., and 10:27 a.m.

35

189.    Internal surveillance camera video footage captured and recorded from within Pod 6800 on May 22, 2021, between 8:29 am and 10:27 am, reflects that Defendant Jones failed to comply with the minimum requirements mandated under 10A N.C.A.C. 14J .0601(a), as Defendant Jones never made or attempted to make an observation of or communicate with Devin Haley within his cell.

190.    Had he even attempted the required observations between 8:29 am and 10:27 am, Defendant Jones would have realized that the window on the door to Devin's cell had been covered, obstructing any potential view inside.  But because he failed to properly carry out his responsibility to observe Devin, the obstruction went unnoticed, undetected and uninterrupted during Defendant Jones' supervisory rounds.

191.    At approximately 10:49 a.m., Nurse Janika Campbell ("Nurse Campbell") arrived at Pod 6800 to administer morning medications to the residents of Pod 6800.

192.    As was customary, Defendant Jones aided Nurse Campbell by knocking on and then opening the door to the cells whose resident was scheduled to receive medication.

193.    At 10:55 am, when Defendant Jones and Nurse Campbell arrived at Devin Haley's assigned cell, the response to Jones' knock was silence.

194.    With the window within the cell door fully obstructed, blocking the view inside the cell, neither Defendant Jones nor Nurse Campbell could detect what the silence was indicating.

195.    Defendant Jones pulled out his key and attempted to unlock and then open the cell door but could not manage to get the door to open.

36

196. Defendant Jones opened the trap slot within the cell door and was able to see that the reason for the silence within Devin Haley's cell was that his body hung lifeless within.

197. Defendant Jones alerted "medical 10-18" using his radio and then again attempted to use his key to open the door and enter Devin's cell.

198. Defendant's second attempt at opening the door was successful, though well past any opportunity to resuscitate Devin. Once inside, Defendant Jones approached Devin Haley's lifeless body, which was suspended by a knotted blanket wrapped around Devin's neck on one end and affixed to the cell's window frame on the other.

199. The blanket around Devin's neck had a series of knots all of which were tightly bound, and when Defendant Jones was unable to unfasten the knots, he grabbed the top knot, placed one foot on the adjacent wall, and yanked downward releasing the blanket from the window frame on which it hung.

200. Nurse Campbell left Devin Haley's cell, and retreated from Pod 6800 while Defendant Jones worked to lower Devin's suspended, lifeless body.

201. Defendant Jones then called into his radio a second time reciting " Medical 10-18" and requesting assistance again.

202. Defendant Jones then called for assistance from Nurse Campbell over the radio as well.

203. Several minutes later, Nurse Campbell, Defendants Captain Mackin and Sgt. Currin, and Sergeant Leonard ("Sgt. Leonard"), and reported to Pod 6800 in response to Defendant Jones' alert for assistance.

204.   Nurse Campbell and Sgt. Currin entered Devin's cell where his lifeless body lay on the floor, facedown halfway under the bed.

205.   Together, Nurse Campbell and Sgt. Currin grabbed Devin's body and pulled it out from under the bed, turning him and placing him prone on his back, face-up.

206.   Defendant Sgt. Currin noted that Devin was rigid and that once laying on his back, Devin's legs remained in the air.

207.   Nurse Campbell noted that the color of Devin's skin was gray and purple, and that his legs were firm and stiff.

208.   Nurse Campbell detected neither any breathing nor any pulse coming from Devin's lifeless body.

209.   Two additional nurses, Chiffalo and Elliott, responded to Defendant Jones' earlier alert for assistance and reported to Pod 6800. Chiffalo and Elliot entered Devin's cell and performed CPR on Devin until Mecklenburg County Emergency Medical Services arrived. Their CPR efforts to resuscitate Devin Haley were unsuccessful.

210.   Mecklenburg County Emergency Medical Services paramedic, Veronica Brittain, pronounced Devin Haley dead in his cell at 11:12 a.m. on May 22, 2021.

211.   Defendants had more than sufficient knowledge of Devin's deteriorating mental health and had immediate access to the mental health care required, yet they acted with deliberate indifference to and blatant disregard for Devin's safety.

212.   Having taken custody of Devin under circumstances that deprived him of his normal opportunities for self-protection, Sheriff McFadden, and any and all agents,

employees, and detention officers assigned to the Detention Center while Devin was there, created a special relationship with Devin.

213. On May 22, 2021, Devin died as a direct and proximate result of the wrongful actions and inactions of the Defendants. His death could have easily been avoided by the provision of basic mental health care and the administration of the well-known and effective medication proven to reverse the depressive effects of Devin's mental health condition.

214. The wrongful acts and omissions of each defendant combined and cooperated with the negligence of the other defendants, as alleged herein, to cause Devin's death.

215. Upon information and belief, Devin's death is not the first time a resident or detainee in the care, custody and safekeeping of Sheriff McFadden, his agents, employees and/or officers assigned to the Detention Center has died at the Detention Center as a result, in part, of failure to properly monitor and supervise residents and detainees, failure by Sheriff McFadden and others to properly train and supervise their agents, employees, medical staff and/or officers assigned to the Detention Center, the failure to comply with North Carolina statutes and/or administrative codes, and or the failure to secure adequate and emergency medical care to residents and detainees, including but not limited to those described below involving residents and detainees in the care and custody of Sheriff McFadden at the Detention Center.

216. Kenneth Bigham, Jerome Thompson, Karla Griffin died as a result of suicide in the Detention Center in 2018. That same year, Jemarcus McIlwaine died in custody at the Detention Center of a drug overdose.

217. Michael Trent died of a drug overdose while in custody at the Detention Center in 2019.

218. In 2020, Michael Mangan died while in custody at the Detention Center. Investigation by the N.C. Department of Health and Human Services ("NCDHHS") revealed that the Sheriff's department was in violation of 10A N.C.A.C. 14J .0601 (a) for failure to conduct adequate supervision rounds.

219. Upon information and belief, the Detention Center was also cited in 2020 because paper was covering the windows of eleven cell doors, making it hard for officers to see inside the cells.

220. On May 14, 2021, just eight days before Devin's death, Karon Golightly died in the Detention Center, and a later inspection revealed that the Sheriff's department was in violation of 10A N.C.A.C. 14J .0601 (a) for failure to conduct adequate supervision rounds.

221. On December 9, 2021, the Charlotte-Mecklenburg Fraternal Order of Police, Lodge #9 ("FOP") submitted a formal complaint to Mecklenburg County Leaders and State Officials requesting investigation into the staffing shortage at the Detention Center and the directives and policies enacted by Defendant Sheriff McFadden circumventing the supervision standards established in the North Carolina Administrative Code for Jail Rules and Standards.

222. The FOP complaint included incidents involving lack of safety of residents and Detention Center staff beginning in January 2021.

223. On December 21, 2021, the N.C. Department of Health and Human Services ("NCDHHS") conducted an inspection of the Detention Center and later released its report documenting overcrowding and staff shortages that created a dangerous environment.

224. On June 28, 2021, in response to Devin's suicide, NCDHHS Division of Health Service Regulation conducted an inspection of the Detention Center to determine compliance with the requirements in the N.C. Administrative Code.

225. On August 12, 2021, the inspector, Chris Wood, reported that his compliance investigation revealed in the 24 hours prior to Devin's death, multiple violations of the requirement to conduct twice hourly supervision rounds of the residents, including Devin, in the Pod where Devin was housed and that such violations required a plan of correction.

226. In the twenty months since Devin's death, seven more residents/detainees have died at the Detention Center. So far, deficient supervision rounds have been found in investigations related to three of those deaths.

**FIRST CLAIM FOR RELIEF**
**(N.C.G.S. § 162-55 – All Defendants, in**
**their individual and official capacities)**

227. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

228. Defendant Sheriff McFadden, Dr. Biondo, the Detention Defendants and the Wellpath Defendants (collectively, "Defendants") are and were, at all times relevant

herein, duly charged as the keepers of the Detention Center, pursuant to N.C.G.S. § 162-55.

229.   Devin Haley was committed to the custody and care of the Defendants from April 3, 2021 until his death on May 22, 2021.

230.   The conduct of the Detention Defendants and the Wellpath Defendants, alleged herein, was so careless and reckless that it demonstrated a thoughtless disregard of consequences and heedless indifference to the rights and safety of Devin Haley.

231.   The conduct of the Detention Defendants and of the Wellpath Defendants, as described herein, was a proximate cause of Devin Haley's death and constituted a wrong and/or injury to Devin, pursuant to N.C.G.S. § 162-55.

232.   Defendant Sheriff McFadden and Dr. Biondi are liable for the conduct of the Detention Defendants and/or the Wellpath Defendants as described herein, and such conduct is imputed to Sheriff McFadden and Dr. Biondi through the doctrines of agency, vicarious liability and *respondeat superior*.

233.   As a direct and proximate result of the conduct of the Defendants, Devin Haley died a slow and preventable and totally unnecessary death. Consequently Plaintiff, on behalf of the Estate of John Devin Haley, is entitled to recover from each of these defendants, *in their individual and official capacities*, compensatory and punitive damages in an amount in excess of $75,000.00, (and in excess of the minimum jurisdictional limits of this Court).

234. Furthermore, Plaintiff, on behalf of the Estate of John Devin Haley is entitled to receive treble damages as set out in N.C.G.S. § 162-55.

## SECOND CLAIM FOR RELIEF
**(Violations of 42 U.S.C. §§ 1983 and 1988 by the Detention Defendants and the Wellpath Defendants in their individual capacities)**

235. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

236. The Detention Defendants and the Wellpath Defendants acted individually under the color of state law, customs, practices, usage or policy at all times mentioned herein as Sheriff's deputies, detention officers, medical staff and/or such other personnel and/or employees and had certain duties imposed upon them with regard to Devin Haley.

237. The Detention Defendants and the Wellpath Defendants violated Devin Haley's rights under the United States Constitution, including rights secured by the Eighth and Fourteenth Amendments, and/or federal law by intentionally, willfully, maliciously, and with conscious and deliberate indifference, failing to secure adequate and reasonable medical and mental health care to Devin, all of which were readily available, when they knew that Devin faced a substantial risk of harm, and by disregarding such risk by failing to take reasonable measures to abate it.

238. The Detention Defendants and Wellpath Defendants all had actual and/or constructive knowledge that Devin was severely depressed, was displaying erratic behavior, had engaged in self-injury and that Devin required serious medical and

mental health attention. Not only did the Detention Defendants and the Wellpath Defendants not secure reasonable medical treatment for Devin but they placed Devin in a single person cell where he was unsupervised and effectively unmonitored at a time when he required urgent medical attention, and where he ultimately died.

239. The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution and is a right which any reasonable detention officer, medical provider, or mental health professional in the position of each of the Detention Defendants and the Wellpath Defendants would have known. As a result, the defense of qualified immunity is unavailable to and has been waived by each of these defendants.

240. As a direct and proximate result of the deprivation of Devin's constitutional and federal rights as alleged herein, Devin was overcome by severe depression, hung himself and died a slow, preventable and completely unnecessary death. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from each of the Detention Defendants and the Wellpath Defendants, *in their individual capacities,* damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

241. Furthermore, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover punitive damages as set out in N.C. Gen. Stat. § 28A-I8-2(b)(5) to punish the Detention Defendants and the Wellpath Defendants for their illegal,

44

unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter such conduct by others.

## THIRD CLAIM FOR RELIEF
### (Violations of 42 U.S.C. §§ 1983 and 1988 by Sheriff McFadden and Dr. Biondi in their individual and official capacities)

242. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

243. Sheriff McFadden was, at all times relevant herein, responsible for the formulation and execution of policies regarding the custody, care and safekeeping of residents at the Detention Center.

244. Dr. Biondi was, at all times relevant herein, responsible for the formulation and execution of policies regarding the medical care provided to residents and detainees at the Detention Center.

245. Upon information and belief, at all relevant times herein, Sheriff McFadden and Dr. Biondi, acting under color of state law, had in effect *de facto* policies, practices, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of the officers and/or medical staff working in the Detention Center, as herein alleged, including, *inter alia*:

   a. The failure to adequately train, supervise, instruct and/or monitor officers and/or medical staff assigned to the Detention Center in the proper method for evaluating residents and detainees;

   b. The failure to adequately train, supervise, instruct and/or monitor officers and/or medical staff assigned to the Detention Center in the proper methods for assisting and treating residents and detainees with serious medical or mental health conditions;

45

c. The failure to see that proper methods were being employed to evaluate the conditions of residents and detainees in the Detention Center;

d. The failure to see that proper methods were being employed to assist and treat residents and detainees in the Detention Center with serious medical and/or mental health conditions;

e. The failure to properly supervise officers and or medical staff assigned to the Detention Center;

f. The failure to adequately staff the Detention Center with officers and medical staff;

g. The failure to see that residents and detainees at the Detention Center were supervised properly to maintain safe custody of such residents and detainees;

h. The failure to see that officers and/or medical staff assigned to the Detention Center supervised residents and detainees sufficiently to be at all times informed of the residents and detainees' general health and emergency medical and/or mental health needs;

i. The failure to properly train and/or supervise agents, employees, medical staff and officers so that residents and detainees, including Devin Haley, were provided with protection and care while incarcerated;

j. In failing to draft and/or institute proper policies and/or procedures necessary to see that residents and detainees are provided appropriate, necessary and adequate medical and mental health care and protection from emergency and perilous medical and mental health conditions;

k. If such policies/procedures exist, in failing to follow them in providing for the appropriate medical and mental health care, protection and care necessary to ensure Devin Haley's well-being;

l. The failure to implement proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, observation, and housing of residents and detainees in the Detention Center including, and especially, residents and detainees who are displaying erratic behavior, engaging in self-injury, have a previous

46

record of mental illness, have a previous record of prior suicide attempts and/or have serious medical and/or mental health conditions;

m. The failure to see that officers and/or medical staff assigned to the Detention Center complied with existing policies procedures;

n. The failure to see that officers and/or medical staff assigned to the Detention Center complied with applicable statutes and administrative codes;

o. The failure to see that officers and/or medical staff assigned to the Detention Center were not assigned other duties that would interfere with the continuous supervision, custody, or control of residents and detainees; and

p. Other policies, customs, and practices to be identified during the course of discovery and/or trial.

246. Upon information and belief, Sheriff McFadden and Dr. Biondi had actual and/or constructive knowledge that the officers, medical staff, supervisors, agents and/or employees in the Detention Center were, and had been, prior to May 22, 2021, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to residents and detainees such as Devin Haley.

247. Upon information and belief, Sheriff McFadden and Dr. Biondi's responses to such actual and/or constructive knowledge, even after repeated instances of injury or death to other residents and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein. In fact, by their conduct, these defendants created and encouraged a culture of neglect and indifference towards residents and detainees in the Detention Center.

248.   Upon information and belief, the misconduct of officers, medical staff, supervisors, agents and/or employees in the Detention Center, including, but not limited to the deprivation of the constitutional rights of residents and detainees at the Detention Center and the failure: to comply with applicable administrative codes, to properly monitor and supervise residents and detainees in the Detention Center, to provide adequate and reasonable medical care to residents and detainees in the Detention Center, had occurred on multiple prior occasions and was widespread in the Detention Center. Moreover, Sheriff McFadden and Dr. Biondi had actual and/or constructive knowledge of the multiple, documented, and widespread abuses by the officers, medical staff, supervisors, agents and/or employees in the Detention Center, yet these defendants took not steps to prevent such abuses.

249.   As a direct and proximate result of said policies, practices and customs, Devin Haley was denied his rights under the United States Constitution including rights secured by the Eighth and Fourteenth Amendments, and/or federal laws.

250.   The right to reasonable medical treatment is a clearly established constitutional right, pursuant to the Eighth and Fourteenth Amendments to the United States Constitution, and is a right which any reasonable Sheriff, officer, or medical staff, in the position of each of the Defendants would have known. As a result, the defense of qualified immunity is unavailable to, and has been waived by, Sheriff McFadden and Dr. Biondi.

251. As a direct and proximate result of the deprivation of Devin's constitutional and federal rights as alleged herein, while in the custody of Detention Center and totally unable to fend for himself, Devin Haley died a slow, preventable and totally unnecessary death. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from each of defendants Sheriff McFadden, *in his individual capacity and in his official capacity as Sheriff of Mecklenburg County,* and Dr. Biondi *in his individual capacity and in his official capacity as Medical Director,* compensatory damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court), including for Devin's pain and suffering prior to his death, lost earnings, and wrongful death damages.

252. Furthermore, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover punitive damages as set out in N.C.G.S. § 28A-18-2(b)(5) from each of defendants Sheriff McFadden and Dr. Biondi, in their individual capacities to punish these defendants for their illegal, unconstitutional, egregiously wrongful, reckless and willful misconduct and to deter such conduct by others.

### FOURTH CLAIM FOR RELIEF
### (Violations of 42 U.S.C. §§ 1983 and 1988 by Mecklenburg County)

253. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

254. Mecklenburg County was, at all times relevant herein, responsible for the formulation and execution of policies regarding the provision of medical care to residents and detainees in the Detention Center.

255. Upon information and belief, at all relevant times herein, Mecklenburg County, acting under color of state law, had in effect *de facto* policies, practices and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of officers and medical staff working in the Detention Center, as herein alleged, including, *inter alia*:

   a.  The failure to implement proper plans, policies and/or procedures necessary to see that residents and detainees are provided appropriate, necessary and adequate medical and mental health care and protection from emergency and perilous medical conditions;

   b.  The failure to draft and/or institute proper plans, policies and/or procedures designed to protect the health and welfare of residents and detainees at the Detention Center;

   c.  The failure to draft and/or institute proper plans, policies and/or procedures regarding medical and mental health supervision of residents and detainees at the Detention Center;

   d.  The failure to draft and/or institute proper plans, policies and/or procedures regarding emergency medical and mental health care for residents and detainees at the Detention Center to the extent necessary for their health and welfare;

   e.  If such policies/procedures exist, in failing to see that such policies and procedures were followed;

   f.  The failure to implement proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, observation, and housing of residents and detainees in the Detention Center in need of medical or mental health care including, and especially, residents and detainees who are severely depressed, are displaying erratic behavior, are engaging in self-injury, have a previous record of mental illness, have a previous record of suicide attempts and/or have serious medical or mental health conditions; and

   g.  Other policies, customs, and practices to be identified during the course of discovery and/or trial.

50

256. As a direct and proximate result of said policies, practices and customs, Devin Haley was denied his rights under the United States Constitution including rights secured by the Eighth and Fourteenth Amendments, and/or federal laws.

257. As a direct and proximate result of the deprivation of Devin Haley's constitutional and federal rights as alleged herein, Devin Haley died a slow, preventable and totally unnecessary death. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from Mecklenburg County compensatory damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

## FIFTH CLAIM FOR RELIEF
### (Wrongful Death - The Detention Defendants and the Wellpath Defendants, in their individual capacities)

258. Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

259. The Detention Defendants and the Wellpath Defendants each owed the following duties to Devin Haley: to perform their duties, and to see that other detention officers, medical staff, agents and employees assigned to the Detention Center performed their duties in such a way as to avoid placing Devin in danger of injury or death; to be present and available to provide continuous supervision of Devin to see that his custody was secure and that he would be protected; to supervise Devin sufficiently in order to maintain safe custody and control of Devin and to be at all times informed of Devin's general health, mental health and

51

emergency medical and/or mental health needs; and to secure emergency medical care in the event that Devin suffered a medical or mental health emergency.

260. The Wellpath Defendants each owed the following additional duties to Devin Haley: to care for and treat him using reasonable and ordinary care in accordance with the skill, training, and experience of medical and mental health professionals practicing in the same or similar communities; to exercise reasonable care and diligence in the application of their knowledge and skill to Devin's care; and to use their best judgment in the treatment and care of Devin.

261. The Detention Defendants and the Wellpath Defendants collectively and individually breached these duties with regard to Devin Haley in various ways including, but not limited to, the following

     a. In failing to provide or secure necessary and adequate medical and/or mental health attention to Devin Haley;

     b. In failing to use even slight care and caution in safekeeping Devin Haley;

     c. In failing to sufficiently monitor Devin Haley during his detainment so as to determine his safety and well-being;

     d. In failing to properly train and/or supervise agents, employees, medical staff, and officers under their command in the proper methods for identifying residents and detainees in need of serious medical and/or mental health attention;

     e. In failing to properly train and/or supervise agents, employees, medical staff, and officers under their command to see that residents and detainees, including Devin Haley, are provided with protection and care while incarcerated or detained;

     f. If such policies/procedures exist, in failing to follow the same in providing for the appropriate medical care, protection and care necessary to ensure Devin Haley's well-being;

52

g. In failing to draft and/or institute proper policies and/or procedures necessary to see that residents and detainees are provided appropriate medical and mental health care and protection from emergency and perilous medical and mental health conditions;

h. If such policies/procedures exist, in failing to follow the same in providing for the appropriate medical and mental health care, protection and care necessary to ensure Devin Haley's well-being;

i. In failing to heed or respond to information and reports from other residents so as to determine the severity and significance of Devin's medical and mental health condition and so as to aid in procuring and administering the necessary treatment, monitoring, and supervision to Devin Haley;

j. In conducting themselves in an egregious and arbitrary manner;

k. In failing to take the appropriate steps to provide proper and sufficient medical and mental health treatment, monitoring and supervision to Devin Haley when they had actual and constructive knowledge of Devin's condition, that Devin engaged in self-injury and his previous record of mental illness and suicide attempts;

l. In knowingly, deliberately and consciously denying appropriate medical and mental health treatment, monitoring and supervision to Devin Haley;

m. In failing to properly communicate with detention officers, medical staff and/or physicians regarding Devin's condition;

n. In failing to properly coordinate the evaluation, monitoring, and supervision of Devin Haley;

o. In completely ignoring reports from other residents and detainees regarding Devin's mental health condition and his need for emergency medical treatment;

p. In failing to communicate to other detention officers, supervisors, medical staff, and/or physicians reports from other residents and detainees regarding Devin's mental health condition and his need for emergency medical treatment;

q. In failing to implement or follow policies and procedures related to the monitoring, supervision, custody, control, and safekeeping of residents and detainees, such as Devin Haley;

r. In failing to comply with applicable statutes and administrative codes including, but not limited to, N.C.G.S. § 153A-224 and 10A N.C.A.C. 14J .0601;

s. In failing to secure adequate medical treatment for Devin when they had actual and constructive knowledge that Devin was severely depressed, was displaying erratic behavior, had engaged in self-injury and had a previous record of mental illness and suicide attempts;

t. In failing to properly monitor and supervise Devin when they had actual and constructive knowledge that Devin was severely depressed, was displaying erratic behavior, had engaged in self-injury and had a previous record of mental illness and suicide attempts;

u. In placing Devin in a single person cell where he was not properly monitored and supervised;

v. In assigning, or allowing the assignment, of officers to other duties that interfered with the continuous supervision, custody and control of Devin Haley; and

w. In other ways to be identified during the course of discovery and/or trial.

262. The negligent, grossly negligent, willful and wanton and reckless acts and omissions of the Detention Defendants and Wellpath Defendants, as alleged herein, constitute proximate causes of the death of Devin Haley. Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover compensatory and punitive damages under the North Carolina Wrongful Death Statute, N.C.G.S. § 28A-18-2, as more particularly described below.

263. The acts and omissions of the Detention Defendants and the Wellpath Defendants were malicious, corrupt, intentional, illegal, unreasonable, needless,

54

willful and wanton, and these Defendants acted with conscious and reckless disregard for the lives and safety of others. Based on their conduct, the Detention Defendants and the Wellpath Defendants are not entitled to immunity from personal liability and may be sued in their individual capacities.

264. As a direct and proximate result of the conduct of the Detention Defendants and the Wellpath Defendants, Devin Haley died a slow, preventable and totally unnecessary death. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from each of the Detention Defendants and the Wellpath Defendants, *in their individual capacities,* compensatory damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

265. Furthermore, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to receive punitive damages as set out in N.C. Gen. Stat.§ 28A-18-2(b)(5) to punish the Detention Defendants and the Wellpath Defendants for their illegal, egregiously wrongful, reckless and willful misconduct and to deter such conduct by others.

## N.C.R. Civ. Pro. 9(j) - WELLPATH DEFENDANTS

266. The attorneys representing Plaintiff object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require plaintiffs to prove their case before factual discovery has even begun, that this Rule denies medical malpractice plaintiffs their rights of due process and equal protection under the law, of the right to open courts, and of the right

to a jury trial (in violation of both the United States and North Carolina Constitutions). Furthermore, Rule 9(j) is an unconstitutional violation of the following: (a) Amendment VII and Amendment XIV of the United States Constitution; and (b) Article I, Sections 18, 19 and 25 of the North Carolina Constitution. In addition, this complaint also alleges facts establishing breaches of constitutional and common law duties for which certification of compliance with Rule 9(j) are not required. In particular, certain claims in this suit do not allege "medical malpractice by a health care provider ... in failing to comply with the applicable standard of care," but rather, allege claims based on deprivation of constitutional rights and based on the principles of *respondeat superior* and apparent agency. Such claims fall outside the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure and, as such, compliance with Rule 9(j) with respect to these and other claims is not required.

267. Without waiving these objections, the attorneys for Plaintiff provide information below to comply with the requirements of Rule 9(j) in an abundance of caution. Pursuant to Rule 9(j) of the Rules of Civil Procedure, the medical care by the Wellpath Defendants and all medical records pertaining to the alleged negligence of the Wellpath Defendants that are available to Plaintiff after reasonable inquiry has/have been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care. In addition, should a Court later determine that

anyone who has reviewed the medical care by the Wellpath Defendants does not meet the requirements of Rule 702(b) or 702 (c) of the Rules of Evidence, then Plaintiffs will seek to have such person(s) qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence, and Plaintiff moves the Court (as provided in Rule 9(j) of the Rules of Civil Procedure) that such person(s) be qualified as an expert witness under Rule 702(e) of the Rules of Evidence.

### SIXTH CLAIM FOR RELIEF
**(Wrongful Death – Mecklenburg County and Sheriff McFadden and Dr. Biondi in their individual and official capacities)**

268.   Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

269.   Defendants Sheriff McFadden and Dr. Biondi owed the following duties to Devin Haley: to see that detention officers, medical staff, agents and/or employees assigned to the Detention Center performed their duties in such a way as to avoid placing Devin in danger of injury or death; to see that detention officers, medical staff, agents and employees assigned to the Detention Center would be present in sufficient numbers and available to provide continuous supervision of Devin so that his custody would be secure and that he would be protected; to see that detention officers, medical staff, agents and/or employees assigned to the Detention Center would supervise Devin sufficiently in order to maintain safe custody and control of Devin and to be at all times informed of Devin's general health and mental health and emergency medical and mental health needs; and to see that emergency

57

medical or mental health care would be provided in the event that Devin suffered a medical or mental health emergency.

270. Defendant Sheriff McFadden and Dr. Biondi breached these duties described herein in various ways, including, but not limited to, the following:

a. In failing to adequately train, supervise, instruct or monitor officers and/or medical staff assigned to the Detention Center in the proper method for evaluating residents and detainees;

b. In failing to adequately train, supervise, instruct or monitor officers, employees, agents and/or medical staff assigned to the Detention Center in the proper methods for identifying residents and detainees in need of serious medical attention;

c. In failing to adequately train, supervise, instruct or monitor officers, employees, agents and/or medical staff assigned to the Detention Center in the proper methods for assisting and treating residents and detainees with serious medical conditions;

d. In failing to see that proper methods were being employed to evaluate residents and detainees in the Detention Center;

e. In failing to see that proper methods were being employed to assist and treat residents and detainees in the Detention Center with serious medical conditions;

f. In failing to properly supervise officers, employees, agents and/or medical staff assigned to the Detention Center;

g. In failing to see that residents and detainees at the Detention Center were supervised properly to maintain safe custody of such residents and detainees;

h. In failing to see that officers and/or nurses assigned to the Detention Center supervised residents and detainees sufficiently to be at all times informed of the residents and detainees' general health and emergency medical needs;

i. In failing to properly train and/or supervise officers, employees, agents and/or medical staff so that residents and detainees,

58

including Devin Haley, were provided with protection and care while incarcerated and detained;

j.  In failing to implement and train officers, employees, agents and/or medical staff in proper policies and/or procedures necessary to see that residents and detainees are provided appropriate, necessary and adequate medical care and protection from emergency and perilous medical conditions;

k.  If such policies/procedures exist, in failing to see that such policies/procedures were followed;

l.  In failing implement and train officers, employees, agents and/or medical staff under his command in proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, observation, and housing of residents and detainees in the Detention Center including, and especially, residents and detainees who are severely depressed, are displaying erratic behavior, have engaged in self-injury, have a previous record of mental illness and prior suicide attempts, and/or have serious medical and/or mental health conditions;

m.  In failing to see that officers, employees, agents and/or medical staff with the Detention Center complied with existing policies and procedures;

n.  In failing to see that officers, employees, agents and/or medical staff assigned to the Detention Center complied with applicable statutes and administrative codes;

o.  In failing to see that officers, employees, agents and/or medical staff assigned to the Detention Center were not assigned other duties that would interfere with the continuous supervision, custody, or control of residents and detainees;

p.  In failing to take action when they had actual and/or constructive knowledge that the officers, employees, agents and/or medical staff in the Detention Center were, and had been prior to May 22, 2021, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to residents and detainees such as Devin Haley; and

q.  In other ways to be identified during the course of discovery and/or trial.

59

271. At the time that Dr. Biondi, the Detention Defendants and the Wellpath Defendants committed the negligent, grossly negligent, willful and wanton and reckless acts and omissions described herein, they were acting within the course and scope of their employment and/or agency with Sheriff McFadden, as the Sheriff of Mecklenburg County, or, in the alternative, Mecklenburg County. As such, Sheriff McFadden and/or Mecklenburg County is/are liable for the conduct of Dr. Biondi the Detention Defendants and the Wellpath Defendants and such conduct is imputed to Sheriff McFadden and/or Mecklenburg County through the doctrines of agency, vicarious liability and *respondeat superior*.

272. As a direct and proximate result of the negligent, grossly negligent, willful and wanton and reckless acts and omissions, as described herein, of Sheriff McFadden, Dr. Biondi and those of the Detention Defendants and Wellpath Defendants which are imputed to Sheriff McFadden and/or Mecklenburg County, Devin Haley died a slow, preventable and totally unnecessary death. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from each of defendants Mecklenburg County, Sheriff McFadden, *in his individual capacity and in his official capacity as Sheriff of Mecklenburg County,* and Dr. Biondi, *in his individual capacity and in his official capacity as Medical Director* damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

273. Furthermore, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to receive punitive damages as set out in N.C. Gen. Stat. § 28A-18-2(b)(5) to punish

Mecklenburg County and/or Sheriff McFadden for the illegal, egregiously wrongful, reckless and willful misconduct committed by their agents and employees and *to* deter such conduct by others.

## SEVENTH CLAIM FOR RELIEF
### (Action on Bond/s and N.C.G.S. § 58-76-1, *et seq.* - Sheriff McFadden and Ohio Casualty - Surety)

274.   Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

275.   As alleged herein, Sheriff McFadden neglected the duties of his office, and committed misconduct and misbehavior, as Sheriff of Mecklenburg County.

276.   Devin Haley died as a proximate result of Sheriff McFadden's neglect, misconduct and/or misbehavior in office. Consequently, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to recover from Surety damages in an amount in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

## COMPENSATORY DAMAGES

277.   Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

278.   At the time of his death, Devin Haley was 41 years of age and almost his entire adult life lay ahead of him.  Devin was intelligent, considerate and kind and he enjoyed life immensely.

279.   Devin is survived by his mother, Patricia Haley, his father Edward Haley and his brothers Ted and Jaime. Devin shared bonds of genuine love and affection

with all his family. By reason of the wrongful and negligent acts and omissions of all defendants, as heretofore alleged, Devin's family has been forever deprived of his society and their relationship with a wonderful young man.  In particular, Patty and Ted Haley, Devin's parents and the beneficiaries of his estate, have been forever deprived of Devin's services, care, protection, and assistance, as well as his society, companionship, comfort, guidance, kindly offices, advice, love, and affection. Reasonable and necessary funeral and burial expenses were also incurred.

280.   Plaintiff is entitled to recover from all defendants, jointly and severally, all damages permitted by N.C.G.S. § 28A-18-2, a sum in excess of $75,000.00 (and in excess of the minimum jurisdictional limits of this Court).

281.   Plaintiff is also entitled to recover from all defendants, jointly and severally, treble damages, pursuant to N.C.G.S. § 162-55.

## PUNITIVE DAMAGES

282.   Plaintiff repeats, re-alleges and re-asserts all allegations set forth in the preceding paragraphs as if fully set forth herein.

283.   By reason of the grossly negligent, reckless, malicious, needless, willful and wanton conduct of the defendants as alleged herein, as well as defendants' conscious disregard and disclaim for the safety of Devin Haley, and other members of the general public as alleged herein, Plaintiff, on behalf of the Estate of Devin Haley, is entitled to receive punitive damages as set out in N.C.G.S. § 28A-18-

2(b)(5) in an amount to be determined at trial but in excess of Seventy Five thousand dollars ($75,000.00) to punish Defendants for their illegal, unconstitutional, unlawful, egregiously wrongful, reckless, willful and wanton misconduct and to deter such conduct by others.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the court:

1.  That the estate have and recover of all Defendants, jointly and severally, individually and in their official capacities, compensatory damages in a sum in excess of $10,000.00 (and in excess of the minimum jurisdictional limits of this Court);

2.  That the estate have and recover of all Defendants, jointly and severally, individually and in their official capacities, punitive damages in a sum in excess of $10,000.00;

3.  That the costs of this action, including interest, together with attorneys' fees, pursuant to 42 U.S.C. § 1988 and as otherwise allowed by law, be taxed to Defendants;

4.  That all issues of fact herein be tried to a jury; and

5.  For such other and further relief as the court deems just and proper.

This the 14th of February, 2023.

/s/*Amanda A. Mingo*
Amanda A. Mingo, NC Bar #24423
/s/ *Katie C. Clary*
Katie C. Clary, NC Bar #39248
Attorneys for the Plaintiff
Rawls, Scheer, Clary & Mingo, PLLC
1011 E. Morehead Street, Ste. 300
Charlotte, NC  28204
T: 704-376-3200/F: 704-376-3200
amingo@rscmlaw.com
kclary@rscmlaw.com

63